LEAH R. SHAW v. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COM-
PANY and Another.[1]

December 13, 1907.

Nos. 15,433—(133).

**Master and Servant—Negligence.**

> This action to recover damages is based on the claim that an emergency
> was created by the conductor in missing his train at a way station, and
> in ordering appellant's intestate, as rear brakeman, to go on top of the
> train during a stormy night for the purpose of stopping it; that the emer-
> gency thus created required the brakeman to perform difficult duties under
> extraordinary circumstances; and that the negligent acts of the conductor
> constituted the proximate cause of the accident.

> *Held*, that the evidence is not sufficient to sustain the charge of negli-
> gence.

> *Held*, also, that the evidence does not make out a case of negligence on
> the part of the conductor in caring for the injured man after discovering
> him.

Action in the district court for Hennepin county by the administra-
trix of the estate of Charles D. Shaw, deceased, to recover $5,000 for
the death of plaintiff's intestate. The case was tried before Brooks,
J., who directed a verdict in favor of defendants. From an order
denying a motion for a new trial, plaintiff appealed. Affirmed.

*H. E. Fryberger*, for appellant.

*F. W. Root*, for respondents.

LEWIS, J.

Appellant's intestate was the rear brakeman on one of respondent
company's trains operating between Minneapolis and Aberdeen, South
Dakota. The train consisted of forty seven cars and a caboose, and
was operated by a crew of five men, consisting of the engineer and
fireman, head and rear brakemen, and the conductor. At about four
o'clock a. m., August 22, 1906, during a severe electrical storm, the
train arrived at the village of Sacred Heart and took the side track
for the purpose of enabling a passenger train to go by. When the

[1] Reported in 114 N. W. 85.

passenger train had passed, the conductor, who was then standing on the ground at the street crossing, about midway of the train, signaled the engineer to go ahead, expecting to board the caboose when it reached him, but failed to get on it, and the train went by him. He ran after it, calling and shouting to Shaw, the brakeman, to swing down the train. Shaw heard him, and went on top of the caboose for that purpose, and in some manner fell, and was found by the conductor at a point several hundred feet west of the west switch, with his arm and leg broken, and bleeding. This action was brought to recover damages upon the theory that the conductor was guilty of negligence in not being at his proper post of duty, and in failing to get aboard the train, thereby placing the brakeman in an emergency by the order to stop the train, which was the proximate cause of the injury, and, further, that the conductor was negligent in caring for the injured man after discovering him. The court directed a verdict for respondent upon the ground that the evidence was insufficient to sustain a verdict.

Appellant attempted to establish the negligence of respondent as follows: That the conductor was derelict in his duty, that in the exercise of ordinary care he ought to have gotten upon his train, that if he had boarded the train it would not have been necessary for him to direct Brakeman Shaw to signal it to stop, and consequently, that Shaw would not have been exposed to the hazard of going on top of the train for that purpose, and the accident would not have occurred. This line of argument assumes that the evidence was sufficient to warrant the jury in finding that an emergency was created by the negligence of the conductor, and that the accident occurred while the brakeman, acting under extraordinary circumstances, was endeavoring to carry out the order.

The conductor was called as a witness for cross-examination under the statute, and testified that he took his position at the Main street crossing, in order that he might cause the train to be separated in case travelers upon the highway at night should have occasion to cross the tracks; but that no such occasion arose, and after the passenger train had passed he signaled the engineer to go ahead; that a severe rain and electric storm was in progress, and it was very dark; that he was about to mount the steps of the caboose when a heavy

flash of lightning blinded him, so that he could not see, and the train passed on; that he ran after it to a point a little beyond the west switch, and when within four or five car lengths of the train he saw Shaw get off the caboose and close the switch, give the usual highball signal to go on, and get on again; that he shouted to him, "For Christ's sake, Charley, swing her down;" that Shaw saw him and went right up on top of the caboose for that purpose; that he continued to see the light of Shaw's lantern just long enough to see him go over the cupola of the caboose, and saw him no more; that he had gotten a short distance beyond the switch, when he found he could not overtake the train and stopped, and then heard some one calling, and went on and found Shaw about eight hundred feet west of the west switch. The engineer was unaware of what had happened, and took the train to the next station about twenty three miles distant. The conductor admitted being in the station house, but it was not brought out whether he remained there one or ten minutes, whether he was there in pursuance of his duties as conductor, or for the purpose of getting out of the storm.

Appellant called a locomotive engineer and fireman as an expert witness, who testified that it was the usual practice for a conductor to wait for the caboose, but that if the train got to going too fast, and he saw that he couldn't make it, then he would naturally get on the side of a car, and drop off at the switch, and then get on the caboose, knowing that the train would slow up to pick up the man who shut the switch.

Appellant insists that the conductor's testimony is unworthy of belief, for the reason that he had made other and contradictory explanations of his failure to board the train. Mrs. Shaw testified as follows: "I asked him (the conductor) how the accident happened. As a reason why he missed the train, as I remember, he told me that he slipped and missed the train * * * that it was slippery. Q. Did he say anything about a blinding flash of lightning? A. He did not, to me." The conductor testified that he did not know whether he had told Mrs. Shaw about the flash of lightning, but that he told her it was a very stormy night, and that he had missed the caboose. In conversation with a stenographer representing appellant's counsel, the conductor merely stated that he had missed the train—did not happen to catch it.

It was not denied that it was a very stormy night, and we fail to find anything in the conductor's account of what took place, or in the entire evidence, which justifies the inference that he was not at the street crossing, and that his failure to get on the caboose as it passed was anything more than the result of a mistake of judgment, or, as he says, "because of the flash of lightning" at that particular moment, which interfered with his purpose. The alleged contradictory statements do not amount to absolute contradictions. He may have slipped. It was a slippery night. He did miss the train. He did not happen to catch it. And simply because, in his conversation with appellant and others, he failed to mention that there was a flash of lightning which interfered with his movement, is not sufficient ground for challenging the truthfulness of his statements at the trial. Having missed his train, it was the conductor's duty to give the signal to the rear brakeman to bring it to a stop.

No question is made but that it was the duty of the brakeman to do exactly what he did do. There were three ways of stopping the train: (1) To signal it down with a lantern, but with a long train, especially on a dark and stormy night, it would be very difficult for the engineer or head brakeman to see the signals. (2) To commence with the caboose and set the brakes on as many cars as would be necessary to attract the attention of the engineer that something was wrong and cause him to stop. (3) To go forward five cars, to a point where the air brake apparatus was in operation, and turn a cock, which would set the air brake and bring the train to a stop. We assume that, when Shaw went upon the caboose, he was acting in pursuance of the conductor's orders and was so acting in going forward over the five cars to reach the air brake. It will not be presumed that he was negligent in the performance of his duty, but the record is silent as to the manner in which he met his death. He may have lost his balance by reason of the storm and the slippery condition of the cars. The train may have given a lurch at a critical moment when he was in the act of stepping from one car to another. He may have lost his lantern, and so made a misstep in the dark. That his injury was occasioned by any negligence on the part of respondents does not appear. It does not even satisfactorily appear that he lost his lantern, although appellant's counsel lays so much stress upon that point. There is no evi-

dence whatever to indicate when, if at all, the lantern dropped. All that the conductor testified to was that after Shaw passed over the cupola of the caboose the light disappeared, and he did not see him again on the train.

Was the conductor negligent in caring for the injured man? It must be remembered that the proper test is, not what occurs to a person subsequently, upon mature deliberation, but whether, under the circumstances, the conductor showed an evident purpose to do what he could, in good faith, to relieve the sufferer at the earliest moment. He said he did the best he could to get assistance and to get the injured man into the hands of a doctor, and that he might have been an hour accomplishing it; that before leaving him he tied handkerchiefs around the broken arm and leg to prevent bleeding, took off his rain coat and laid it over him, making him as comfortable as possible under the circumstances, and then ran to the depot, some fifteen hundred feet distant, which he found closed, and as he was a stranger in the place, and did not know where the agent or any doctor lived, he went up to the main street a block, then turned to his left and went a couple of blocks, and rapped on the door of a certain house and found a man there who happened to be a drayman whom he knew, who, without taking time to dress, went with him to the house of the agent, who hurriedly joined them and they found a doctor; that they then went to the depot and got the section foreman to get them a hand car, and went after Shaw, and brought him down to the depot, and carried him to the doctor's office.

There is no evidence of delay, except the conductor's own statement that it took an hour. He also testified that he remained with Shaw in the doctor's office until he died, from a wound which they found penetrating to the vitals. An attempt was made to show that the conductor had made no statement of that kind to Mrs. Shaw. The attending physician was not called as a witness, and, although pitiable that the injured man could not have received aid sooner, in view of the fact that it was so early in the morning, when every one was probably asleep, and in the absence of other evidence to show neglect, except the statement as to time, it is not permissible to draw the inference of negligence on the part of the conductor.

Affirmed.