LEAH R. SHAW v. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY and Another.[1]

August 14, 1908.

Nos. 15,748—(203).

**Newly Discovered Evidence.**
    The trial court did not abuse its discretion in denying appellant's motion for a new trial upon the ground of newly discovered evidence.

Appeal by plaintiff, as administratrix of the estate of Charles D. Shaw, deceased, from an order of the district court for Hennepin county, Brooks, J., denying plaintiff's motion for a new trial on the ground of newly discovered evidence. Affirmed.

[1] Reported in 117 N. W. 465.

*H. E. Fryberger,* for appellant.

*F. W. Root,* for respondents.

LEWIS, J.

Upon the former appeal (103 Minn. 8, 114 N. W. 85) we affirmed the order of the trial court in directing a verdict for respondent because of the insufficiency of the evidence. After the cause was remanded, appellant moved for a new trial upon the ground of newly discovered evidence.

A statement of facts, and the reasons given for sustaining the former order, will be found in the reported case. The theory upon which appellant attempted to hold respondents responsible for the death of appellant's intestate was that by the negligent act of the conductor, Schlink, in failing to catch his train as it pulled out of the station, an emergency was created which made it necessary for him to call Shaw, the deceased, the rear brakeman, to signal the train to stop. Upon the former appeal it was shown by the testimony of Schlink, who was called for cross-examination, that after the passenger train had left he signaled the engineer of his train to pull out, and then waited at the Main street crossing until the caboose should come along, intending to swing himself on it, and, failing to get it, he ran after the train, but, realizing he would be unable to overtake it at the switch, called to the brakeman, Shaw, to signal down the train.

The only new evidence offered on this branch of the case, necessary to consider, consists of three affidavits by Joseph C. Strommer, who, in the first one, sworn to December 21, 1907, stated that he was the village marshal, and that he was at the depot platform on the morning of the accident, when the trains passed; "that after Schlink had signaled the engineer of the freight train to go ahead on its way west, and after said freight train was in motion and under fair heading and speed, affiant saw said Schlink standing either on the front or rear end of the smoking car of said passenger train in conversation, and talking and laughing and joshing with the trainmen on said passenger train, was paying no attention to his own train, of which he was in charge; * * * that while said Schlink was so engaged said freight train was passing by, and on account of said Schlink's inattention to his duties and to the operation of his freight train, the

caboose on the rear of said freight train passed by, and Schlink then made chase after the same, but too late to catch the caboose; that affiant watched said Schlink chase said train until the caboose got past the west switch, which is about eight hundred feet west of the depot; that affiant noticed the rear end brakeman on said freight train as he was on the back platform of the caboose and signaled, five car lengths, three car lengths, one car length, etc., as the caboose approached said west switch; that when said caboose passed said switch affiant saw the rear end brakeman (Shaw) get off the head or rear end of said caboose, turn and reset the switch, give the highball signal to the engineer to go ahead, and jump on the platform of the caboose; that said Shaw then went up over the rear end of said caboose to the top thereof and started to give a signal with his lantern, and swung his lantern far to the right, Shaw facing west, when suddenly the light disappeared, either going out or being dropped from Shaw's grasp; that there was nothing to conceal the lantern from affiant's view at the time it disappeared, and that at this moment Shaw was standing on the top of the caboose at the cupola, the lights of which were seen by affiant at the time; that Schlink's failing to board said freight train was not due to his foot slipping, or to the speed of the freight train, or to any flash of lightning, but to Schlink's failure to watch his own train; that to the best of affiant's belief there was no lightning during said time, although the night was very dark and it was raining."

Strommer executed a second affidavit on January 17, 1908, in which he modified the previous affidavit by stating that, while the passenger train was standing on the main track at the depot, Schlink gave a signal with his lantern to the head end of his train for the train to pull out to the west; that after giving such signal, and after the passenger train had started, or was about to start, Schlink got up on the front of the platform of the smoking car of the passenger train, going in the direction of and towards his freight train, which was then moving west upon the passing track upon the south side of the passenger train, and was hidden from view; that where Schlink was or what he was doing, at the time the caboose at the rear end of the freight reached and passed Schlink, affiant does not know, because at such time the passenger train was between affiant and the caboose;

that after the smoking car, day coaches, and sleepers of the passenger train had entirely passed from in front of affiant, and the caboose of the freight train was passing west in front of affiant, he saw Schlink running along behind the caboose, carrying his lantern in his hand, in an apparent effort to catch up with the caboose, but that it was moving faster than Schlink could run, and gradually drew away from him; that affiant did not see Schlink between the time he got upon the platform of the smoking car and the time he saw him running after the caboose, and does not know what Schlink was doing in the meantime.

In another affidavit, dated February 24, 1908, Strommer states that at the time the caboose at the rear end of the freight train passed the platform of the smoking car of the passenger train, which was moving east, Schlink was removed from affiant's view; that Schlink was on the smoking car platform, engaged in talking with the crew on that train, at the time it started, and that he heard him talking after he was removed from affiant's view, but that affiant did not know the exact situation of Schlink when the caboose of the freight passed him; that when the passenger train had passed eastward, giving affiant an unobstructed view of the passing track upon which the freight was running, affiant saw Schlink running after his train; that immediately after the passenger train had passed he saw Schlink about ninety feet west of the Main street crosswalk, and about forty feet behind the caboose of the westward bound freight.

A close comparison of the three affidavits discloses that the second one modifies sweeping statements contained in the first, and that the third qualifies the modifications of the second. Taking them all together, they amount simply to this: That at the time the passenger train pulled out Schlink was seen on the platform of the smoking car talking with some of the trainmen. What his movements were after that train began to move is left in uncertainty. Conductor Kinney, of the passenger train, corroborates Strommer as to Schlink being on that train. He states in his affidavit that, while he was standing in the side door of the baggage car of his train, Conductor Schlink stood upon the platform directly in front of the baggage car, and they had a brief conversation, in which Schlink notified him that a certain semaphore signal was not in working condi-

tion, and that as the passenger train started Schlink immediately passed through in the direction of the freight train. The freight train contained forty six or forty seven cars, and as the switch was eight hundred feet from the depot, more than one-half of the train was east of the Main street crossing while the train was at rest on the side track. From all that appears, Schlink could easily have reached the crossing and been in waiting at that point before the caboose came along.

Appellant also claims to have produced new and important evidence tending to show that the deceased was unreasonably neglected and left uncovered and exposed to the elements by Schlink after he found him at the side of the track. The affidavits relate in part to the length of time consumed in getting Shaw into the hands of a physician, which appellant asserts was at least an hour and a half.

A careful reading of all the affidavits on this point fails to sustain the claim of negligence in this respect. It was established beyond any controversy that the freight train did not leave the village of Sacred Heart until after the departure of the passenger train, which left that point two or three minutes before four o'clock, and it must have taken several minutes for the freight train to pull out after that, and several more minutes before Schlink reached Shaw, whom he found nine hundred feet west of the west switch. According to the affidavit of Dr. Benson, he was called at a quarter to five o'clock, so that there is no positive proof that the time exceeded three-quarters of an hour. Schlink estimated it to be an hour; but there is no evidence that any one was keeping strict account of time. The different affidavits contain a number of statements upon hearsay, and many conclusions and inferences; but there is absolutely no definite evidence to suggest that Schlink ruthlessly left Shaw to the mercy of the elements and devoted his time to finding the station agent, in order that he might telegraph his train. It is true that Schlink might have gone to some of the houses a short distance from the point of the accident, and, if he had there found the proper assistance, might have put the injured man under shelter before starting for a physician. But it was a perfectly reasonable and natural thing to go straight back to the depot, which was lighted up and occupied when he left it a short time before. He testified that he ran all the way, and, find-

ing the depot closed, went up the main street a .block, turned to his left, and went a couple of blocks, stopped at a house, and knocked, and found that the drayman, Mr. Dosseth, whom he knew, lived there; that he told him he wanted to find the agent, as a man was hurt, and Dosseth, only partially dressed, hurried along with him to the house of the agent; that they got the doctor, a handcar, and grain door from the section foreman, and went after Shaw, brought him back to the depot, and carried him to the doctor's office.

Dosseth's affidavit in this appeal is substantially to the same effect; that he was called from his bed and to the door by Schlink, who asked him to show him where the agent, Bingham, lived, as one of his men had been hurt; that Schlink was out of breath and panting heavily, as if he had been running hard; that it was raining hard, with flashes of lightning, followed by intense darkness; that affiant was only partly dressed, but without stopping for any further dressing started out with Schlink, ran to within a short distance of Bingham's house, which by the aid of the lightning flashes he could point out to Schlink, who continued on a run, and affiant returned to his own house.

The affidavits of Drs. Dreisbach and Ludemann set out the fact that in February, 1908, about a year and a half after the death of Mr. Shaw, the body was exhumed and examined and they affirm that there was no wound communicating with the abdominal cavity, which was absolutely intact. Very little importance can be attached to this class of evidence so long after interment; but, conceding it to be true that death was caused by the shock and hemorrhage, rather than by a mortal wound penetrating the abdominal cavity, it adds nothing of value to the question now under consideration. Appellant has failed to show, giving due weight to the additional affidavits, that the conductor neglected his duty to Mr. Shaw, and we cannot discover that the trial court abused its discretion.

It not appearing whether the trial court passed upon the question of appellant's lack of diligence in not acquiring the additional information while in preparation for the trial, we refrain from expressing any opinion on that point.

Affirmed.